WESTON ELECTRICAL INSTRUMENT CO. v. STEVENS et al.

(Circuit Court, S. D. New York.   December 8, 1902.)

1. PATENTS—ANTICIPATION.

 If the structures described in prior patents do not themselves anticipate that of a later patent, the descriptions of them in the specifications cannot be *held* to anticipate.

2. SAME—VOLTMETER.

 The Weston reissue patent, No. 11,250 (original No. 433,637), for an electrical measuring instrument, is valid as a reissue, and contains a sufficient description to enable a skilled electrician to construct the instrument. The device was not anticipated by anything in the prior art, but was the first practicable and commercially successful instrument for measuring electrical currents, and especially alternating currents, and is an invention of great merit and usefulness in the art; also *held* infringed.

3. SAME.

 The Weston patent, No. 470,340, for an improved movable coil conductor for use in the electrical measuring instrument, described in the patentee's reissue No. 11,250, discloses patentable invention and is valid.

In Equity.  Suit for infringement of reissued patent No. 11,250 (original No. 433,637), for an electrical measuring instrument, granted to Edward Weston, June 28, 1892, and of letters patent No. 470,-340, granted to the same inventor, March 8, 1892, for an improved coil for such instrument.  On final hearing.

William Houston Kenyon and Kenyon & Kenyon, for complainant.
John P. Croasdale and Joseph C. Fraley, for defendants.

COXE, Circuit Judge.  This is an equity action for infringement founded upon two letters patent, granted to Edward Weston. The first of these, reissue No. 11,250, is for an electrical measuring instrument.  It is dated June 28, 1892, the original being dated August 5, 1890.  The application for the original was filed January 18, 1890. The application for the reissue was filed February 5, 1892.

In the specification the inventor says:

"My invention relates to an electrical measuring instrument intended chiefly for use as an electro-dynamometer for the measurement of alternating currents of electricity.

"My invention consists, broadly, in a fixed or stationary coil and a coil oscillating or vibrating on inclosed pivots in the field of force of said stationary coil, said coils being electrically connected.  The vibrating coil on the passage of the current through the circuit, including both coils, assumes an angular position, depending upon the difference of potential between the terminals of the circuit.  The reversals of the current in both coils occur simultaneously, and hence an index or pointer connected to the movable coil is always deflected in the same direction, thus indicating the extent of said angular movement upon a suitable scale.

"My invention further consists in the construction and arrangement of the instrument, as hereinafter more particularly pointed out."

Again he says:

"In my present device, and so far as I know for the first time in the art, I cause the index of the instrument to move directly to the scale-mark, which is to be read as the indication and there remain, no bringing back to a zero reading being necessary; and also, as I believe for the first time in the art,' I have accomplished this in an instrument where the moving body is, as and

for the reasons already pointed out, controlled by two reacting variable fields—namely, the varying field about the moving coil reacting upon the varying field about the fixed coil. I have discovered that I can balance a coil of fine wire thus actuated against an exceedingly delicate coiled spring or springs, so that the said springs will permit the coil, and hence the index moved by said coil, to move at once to a new position dependent upon the difference in potential between the instrument terminals, and the said springs may be constructed as to strength and elasticity and regulated by the means herein described, so that the indications of the instrument on direct reading will be accurate for all positions of the said movable coil.

"The advantage of the use of two coiled springs, from what has been said, will be apparent. They act as conductors for the current into and out of the coil, obviating the necessity of mercury cups or other form of joint which might offer resistance to the current and introduce friction, hence become oxidized or worn, and hence become a source of error in the instrument. So, also, the instrument having two springs takes the best portable form, and may be used in any position, which obviously could not be done if mercury cups were employed."

The patent has 15 claims, all but the last two being involved. The claims contain the usual tautology and it is unnecessary to examine them all. Claims 4, 6 and 10 are selected as embodying all the essential features of the invention and as representative of all the rest. They are as follows:

"(4) In an electrical measuring instrument, a fixed coil, a movable coil in the field of said fixed coil, an index showing the extent of movement of said movable coil, and a spring opposing and counterbalancing the movement of said movable coil and in circuit therewith, the said elements being constructed and arranged so that said index will be moved directly to show the extent of motion of said movable coil and by the counterbalancing effect of said spring be maintained in such position."

"(6) In an electrical measuring instrument, the combination of a movable conductor actuated by the current to be measured in a field of force maintained by the said current, and a means of indicating the extent of movement of said conductor, the said conductor being constructed to offer such electrical resistance and of such light weight and so freely movable as that the error due to the disturbing effect of self-induction of the actuating current in said conductor shall bear an infinitesimal ratio to the actual indication and be practically nil."

"(10) In an electrical measuring instrument, a stationary coil, a coil vibrating or oscillating in the field of force of said stationary coil, and a spring of conducting material opposing the movement of said vibrating coil, the said coils and spring being electrically connected."

The defenses are lack of patentability, noninfringement and invalidity of the reissue, as such, if construed as the defendants insist it should be.

After the informal but instructive interchange of views between counsel and court at the argument, a discussion at all coextensive with briefs is rendered unnecessary.

Many of the perplexities which usually beset patent causes are entirely absent here. We are enabled to start with several fundamental propositions which, if not admitted, cannot be successfully disputed.

First: Mr. Weston was the first to make a successful commercial voltmeter for measuring alternating currents. His voltmeter soon after coming on the market superseded all others and is to-day recognized as the standard instrument for measuring differences of potential in alternating current circuits.

Second: The device of the patent is small, simple, compact, easily operated and requires no preliminary adjustment. It can be operated at any angle by an unskilled workman and will measure direct as well as alternating currents.

Third: Strictly speaking there is no prior art. If the invention be confined to alternating current devices it can be said with confidence that there were no practical commercial instruments prior to Weston's. There were no instruments entitled to be considered as anticipations. There were two or three instruments, which, as scientific possibilities, could, it is true, reach accurate results; but as every day working devices they were of little value. The most satisfactory of these were, perhaps, the "Thomson balance," invented by Lord Kelvin, the Siemens dynamometer and the Cardew hot wire voltmeter.

The "Thomson balance" is a delicately organized structure valuable in the laboratory, but useless for commercial purposes. It must be accurately leveled and mounted on a firm foundation free from vibrations. No one but an expert can operate it and the final result is only reached after comparison with elaborate tables previously compiled.

The Siemens dynamometer is another complicated and sensitive instrument having a fine wire suspension, mercury cup connections, a torsional spring indicator and several of the faults, noted above, as existing in the "Thomson balance." It was not a direct reader, it was not portable and it required careful leveling after being mounted upon a support free from vibrations.

The hot-wire voltmeter is a clumsy instrument, six feet in length, operating upon an entirely different principle from the device of the patent and depending upon the expansion produced by the heat of the current upon a long taut wire conductor. It was defective, inaccurate, liable to get out of repair and has now disappeared from the commercial electrical world.

There were other instruments, but they were no nearer to the invention than those referred to and have since been relegated to the scrap heaps of the art. They have about the same relation to the Weston device that a mediæval cross-bow has to a modern repeating rifle.

Fourth: The invention is not disclosed in any prior patent or publication.

Fifth: Infringement is clear. The defendants have copied the patented instrument even in its minute details. The only difference entitled to notice is the substitution of a V-shaped spring for the upper flat spiral spring of the patent. The two springs accomplish the same result and are unquestionably equivalents.

It appearing, then, that Mr. Weston was the first to construct a commercial instrument to do this exceedingly important work and that the defendants have appropriated that instrument bodily, it may as well be admitted that the court is not disposed to deprive the inventor of the fruits of his genius and perseverance by subjecting the patent to harsh and technical rules of construction. Few patents that come before the courts are entitled to more liberal treatment.

This is a case where, upon the undisputed testimony, the inventor has accomplished something which has been of unquestioned benefit to the electrical world. In an art crowded with indefatigable and brilliant enthusiasts he has made the only successful alternating current voltmeter in use at the present day. He alone has succeeded, even against the ablest competitors which England, France and Germany could produce.

It is probably true that there is not a lawyer in this circuit who, from a reading of the specification alone, could construct the voltmeter of the patent. The specification is not, however, addressed to lawyers, but to electricians who know the science of electricity and its terms of art just as a chemist knows chemistry and as a surgeon knows anatomy. It matters not how many other people fail to comprehend the meaning of the patent so long as electricians know what it means.

The principal accusation against the patent seems to be that the specification fails to give the necessary information to enable one skilled in the art to practice the invention. It is argued that the prior publications supply this information; if, however, the court should be of the opinion that they do not, then the patent must be held invalid, because it fails, in like manner, to give the necessary details. In other words, the argument seems to be this: Conceding that Weston has made a valuable voltmeter he has failed to describe an invention; the information necessary to construct an operative instrument is either found in the prior publications or it is not; if so found, the patent is anticipated; if not so found the patent fails to supply the information. The defendants' chief reliance is upon the United States patent, granted to Jules Cauderay, of Paris, November 1, 1887, for an electric dynamometer. This instrument was designed for direct currents only; it was useless for measuring alternating potentials; it had a silk-thread suspension and retained many of the faults of the older instruments, which made its success, as a practical device, impossible. There is no proof that the instrument went into use and, if the complainant's experts are correct, it was incapable of accomplishing the results of the Weston structure. Prof. Anthony says:

"As an example of instruments depending upon magnetic forces which totally fail to solve the problem in consequence of the great self-induction as well as for many other reasons, I would refer to the instrument described in the U. S. patent to Cauderay, No. 372,358, and the English patent to the same inventor, No. 225 of 1887. In the instrument described in these two patents there is a moving coil consisting of many turns of fine wire wound upon a spool, the whole being of considerable weight. The coil is said to have a resistance of about one thousand ohms, and this is the only resistance in the circuit. The self-induction of such a coil would be so great as to render it absolutely unfit for an instrument to serve the purpose for which the instrument described in the patents in suit was designed."

The articles in La Lumiere Electrique throw little light upon the controversy; they relate to instruments intended to accomplish different results and operating on different principles.

This array of awkward and impracticable structures emphasizes the importance of the improvement made by Weston. It is not neces-

sary to follow the defendants' argument designed to show that the claims can be read on the articles in La Lumiere Electrique and the description of the Cauderay patent. None of the structures there described was capable of doing the work of Weston's instrument. A description of a failure stands in no more favorable attitude than the failure itself. If the structures described would not anticipate or limit the scope of the patent a description of them cannot be tortured into an anticipation.

It seems unnecessary to point out that a claim for a combination is not invalidated by the fact that all the separate elements are old. It is necessary to show that the combination is old and this is not shown by reconstructing the claim to fit the exigencies of the litigation from a confused mass of prior literature. When the claims of the patent are limited, as of course they must be, to the mechanism described and shown for the accomplishment of a clearly indicated result, it is thought that nothing in the prior publications destroys the claims either by anticipation or fatal limitation. It is possible that the specification might have been more explicit upon the subject of self-induction but it is thought that enough is found in the description, drawings and claims to enable a skilled electrician to construct the instrument. Westinghouse Electric & Mfg. Co. v. Saranac Lake Electric Light Co., 51 C. C. A. 514, 113 Fed. 884, 887.

The patent is not invalid as a reissue. The public acquired no rights between the original and the date of the application for the reissue. The object of the reissue was not to sweep within the net of the patent instruments which had made their appearance during the interval and which did not infringe the original, but it was to define more clearly the purpose of the invention and the principle upon which it operates. That an inventor may do this, when he interferes with no one's just rights, is not open to controversy. Hobbs v. Beach, 180 U. S. 383, 394, 21 Sup. Ct. 409, 45 L. Ed. 586; Adee v. Peck (C. C.) 42 Fed. 497.

It is unnecessary to enter upon a microscopic examination of the claims upon the question of infringement, for the reason that if the claims cover Weston's instrument, and it is thought that they do, they cover defendants' instrument also.

Patent No. 470,340, granted March 8, 1892, is for an invention supplemental and subsidiary to the main invention just considered. It is for the improved movable coil of the instrument described in the original and reissued patents. Referring to this instrument the inventor says, in the specification:

"In order to render the apparatus sensitive, it is necessary to make the movable coil as light as possible, both to reduce the inertia of the coil itself and its dead-weight upon the delicate jewel pivots by which it is supported. My present invention has for its object this reduction in weight of the coils; and to this end I make the coil entirely of insulated wire, using no spool or bobbin or frame for its support."

The claims are as follows:

"(1) An insulated coil conductor having numerous turns cemented together to form a compact annular body and provided with pivots, substantially as described.

"(2) An insulated coil conductor having numerous turns cemented together to form a compact annular body and provided on opposite sides with pivots to which the terminals of said coil are respectively connected, substantially as described.

"(3) An insulated coil conductor having numerous turns cemented together to form a compact annular body, in combination with plates B, carrying pivot-pins C, substantially as described."

The defenses are lack of invention and abandonment. Infringement is admitted. The invention is a comparatively trivial one and consists in improvements in the coil conductors of the prior Weston patents. These changes were as follows: The coil is annular, the paper frame of the prior art is discarded and the pivot carrying plates are secured directly to the wire of the coil by "seizings of thin silk." A coil having these features is not found in the prior art. If the patent disclosed nothing more than a reduction of weight and a change in form, patentability would have to be denied. But this is not the case presented by the proof. The improvements, inconsequential as they seem at first, produced important results in reducing the error of self-induction and thus increasing the accuracy of the Weston voltmeter. The coil was not only lighter and more compact, but it produced a result which was distinctly an improvement over that produced by the coils of the prior art.

The complainant is entitled to the usual decree for an injunction and an accounting.