## WALKER v. CITY OF TERRE HAUTE.

*(Circuit Court, D. Indiana. October 29, 1890.)*

1. PATENTS FOR INVENTIONS—FIRE-ALARMS—REISSUE.
    Letters patents issued July 13, 1875, to Robert Bragg, for the combination with a fire-alarm gong of mechanism which automatically releases the fire-engine horses from their stalls, contained the following claim: "The rod with its knob and the oscillating lever, for the purpose of releasing a suspended weight by the direct action of a gong-hammer." The reissued patent, No. 6,831, issued January 4, 1876, contained these claims: "The trip-rod and oscillating lever, for the purpose of releasing a suspended weight by the movement of a gong-hammer," and "the trip-rod, oscillating lever, and suspended weight in combination with the hammer of a gong, for the purpose of operating mechanism distant from the gong." *Held*, that the claims of the reissue were fairly embraced in the claim of the original.

2. SAME—INFRINGEMENT.
    Said patent is infringed by a device whose only difference from the patented machine is that its trip-rod receives the stroke of the hammer in its backward instead of its forward motion.

In Equity.

*McDonald, Butler & Snow* and *Robert H. Parkinson,* for complainant.
*Baker & Daniels, Horace B. Jones,* and *D. N. Taylor,* for defendant.

GRESHAM, J. The complainant, as assignee of reissued patent No.
6,831, brings this suit for an injunction and accounting against the city
of Terre Haute. The inventor, Robert Bragg, filed his application for
a patent June 16, 1873, and the patent was granted July 13, 1875. The
application for a reissue was filed October 9, 1875, and the reissue was
granted January 4, 1876. The reissue, like the original, covers a com-
bination with a fire-alarm gong of mechanism which operates automat-
ically, and releases the horses from their stalls simultaneously with the
alarm. The device is so arranged that the blow of the gong-hammer,
announcing the alarm, also and at the same time trips the liberating
mechanism, opens the stall-doors, and allows the trained horses to spring
to the pole of the engine before the striking of the signal is completed.
This was a great improvement on the old method of releasing the horses
by hand, and leading them to the pole, and, since its introduction,
engines can and do reach fires more quickly. "The object of my inven-
tion," says the specification, "is to provide a novel attachment for gongs,
and it is principally valuable and applicable to fire-engine houses, where
the horses which draw the engines ought to be released at the very instant
of the first stroke of the alarm, so that they can take their places at the
engine and hose-carriage, ready to be attached thereto by the first man
who may arrive. My invention consists in the employment of an arm
which is so situated that at the first stroke of the hammer upon the gong
it will also strike this arm, which has attached to it any suitable mech-
anism, so that the force of the blow will release, through this mechanism,
a weight. The falling of this weight will pull a rope which is connected
with the mechanism to be operated in such a manner that the pull upon
it will operate the mechanism. * * * The operation will be as fol-
lows: The gong-hammer, upon its first stroke, will strike the pad, E,
and thus force the rod, D, and the arm, or lever, C, back until the roller,
G, is released from the recess, F. * * * Various mechanical devices
may be substituted for those herein described, as will be readily seen;
but the principal point of novelty is the operating of these devices di-
rectly from the gong-hammer." Bragg did not limit himself to the pre-
cise mechanism described in his specifications and illustrated in his
drawings. He had in mind that mechanism and its equivalents,—any
suitable means for utilizing the force of the gong-hammer in releasing a
weight (which is the equivalent of a spring) for operating any distant
mechanism simultaneously with the stroke of the hammer. The claims
of the reissue, which are involved in this suit, (the first and fourth,)
read:

"(1) The trip-rod, D, arranged as described, and the oscillating lever, C, for
the purpose of releasing a suspended weight by the movement of a gong-ham-
mer, substantially as and for the purpose described."

"(4) The trip-rod, D, oscillating lever, C, and suspended weight, B, in com-
bination with the hammer of a gong, for the purpose of operating mechanism
distant from the gong, substantially as above described."

The claims in the original read:

"(1) The rod with its knob, E, and the oscillating lever, C, for the purpose of releasing a suspended weight by the direct action of a gong-hammer, substantially as and for the purpose herein described.

"(2) In combination with rod, D, and the recessed oscillating lever, C, pivoted as described, the weight, B, and its roller, G, for the purpose of relieving friction and removing the rod, D, from the action of the gong-hammer, substantially as herein described.

"(3) In combination with the weight, B, caused to fall, as shown, the bell-crank lever, I, cord, K, and lever, L, for releasing the slide, O, and weight, R, and thus releasing the horses by means of the cord, T, substantially as herein described."

The specifications in both patents describe the same invention. The defendant's expert found no invention referred to in either the description or the claims of the reissure not described in the original as instrumental in carrying out the object of the invention. He thought, however, that the claims of the reissue, without covering any new invention, allowed greater freedom in construction than did the claims of the original. "The rod with its knob, E," one of the elements of the combination in the first original claim, is described in the corresponding claim in the reissue as "the rod, D, arranged as described," the "knob, E," being omitted. In the reissue the rod projects in the path of the hammer, as it did in the original, and operates precisely as it did before. The claims in the original covered any rod extending within the sweep of the gong-hammer, so that, when struck, it would perform the function of tripping, as described. The knob at the end of the rod performed no function independent of the rod, and it was not an operating element in the combination. The original specification showed that the action of the gong-hammer upon the suspended weight was not immediate, or direct, but through intermediate elements, and, literally construed, the claims were not for the invention described, and, while the first claim in the reissue is more accurate, it is still limited to the combination which constitutes the invention,—"a combination of elements, operating substantially as and for the purpose described." Obviously the patentee feared that the original first claim might be held too broad or general, and for that reason he desired the fourth claim, covering a subdivision of the invention. This claim was fairly embraced in the original first claim. It is more limited than that claim, but it is clearly within the original statement of invention. The reissue contains no claim which might not have been made and allowed upon the original record. The real invention consisted in the combination of the designated elements acting in co-operation to accomplish a specified result, and the patentee was not limited to the precise forms of the elements shown in the drawings. Elements possessing the essential qualities and performing the same functions as those described in the specifications, and illustrated in the drawings, although differing in mere mechanical construction or form, were covered by the original patent. A combination patent cannot be evaded by a mere formal variation of all or part of the elements. Even if the claims of the reissue be construed as broader than the original

claims, the former are clearly within the described invention, and the reissue was applied for in less than three months after the original was granted, and before any new rights had intervened. While an inventor may not obtain a reissue enlarging his invention, he may, under proper conditions, surrender his patent, and obtain a reissue with enlarged claims, not extending, however, beyond the bounds of his described invention. It is not claimed that Bragg obtained his reissue to cover improvements made after the date of his first patent, and the defendant's expert testified that the reissue contained no new invention. The supreme court has never so construed the statute which authorizes reissues as to deny to a patentee, on application made in due time, and before adverse rights have accrued, the right to obtain a reissue broad enough to cover his entire invention as originally described and as he intended to claim it. In *Marsh* v. *Seymour*, 97 U. S. 348, the supreme court say:

"The patentee may redescribe his invention, and include in the description and claims of the specification not only what was well described before, but whatever else was suggested or substantially indicated in the old specification, drawings, or patent-office model, which properly belonged to the invention as actually made and perfected. Corrections may be made in the description, specification, or claims of the patent where the patentee has claimed as new more than he had a right to claim, or where the description, specification, or claim is defective or insufficient; but he cannot, under such an application, make material additions to the invention which were not described, suggested, nor substantially indicated in the original specifications, drawings, or patent-office model."

The statute authorized the granting of the reissued patent.

The defense of prior use is not supported by the evidence. Brown S. Flanders testified that in 1869, while acting as engineer in connection with engine No. 8, of the Boston fire department, he constructed and put into practical use a device which operated automatically on the same principle as the device described in the patent in suit, and his statements were corroborated by four or five witnesses, who at that time were his associates in the same company. If the Flanders mechanism was in use, as claimed, as early as 1869, the patent in suit is invalid for want of novelty, and a detailed description of it is therefore unnecessary. The complainant introduced a number of witnesses, who testified that during their connection with the same company in 1869, and for several succeeding years, they never saw or heard of such an automatic device for releasing horses from their stalls. And a still larger number of witnesses, who were employed in other engine-houses in Boston, during the period of alleged prior use, some of whom visited No. 8 from time to time, testified that before the application for the patent in suit they never saw or heard of the Flanders device, or anything like it. A Philadelphia engine company sent a committee to Boston in the spring of 1869 to inspect the engines and fire department of that city, and note all improvements in apparatus and methods, should any be observed, and during the four or five days that the committee spent in Boston, engine-house No. 8 and others were visited and inspected. Flanders

testified that his automatic device was then in use at No. 8, and that it was seen by the committee, and by him explained to them, or some of them; and his statements were corroborated by several witnesses who belonged to the company in 1869, and later.  The surviving members of the committee, as well as several members of their company who went with them, were subsequently called, and testified that neither the Flanders device, nor anything like it, was shown to them by him or any one else, and that they never saw or heard of that device in engine-house No. 8, or elsewhere, during their visit to Boston.  The records of the Boston fire department, covering the period of alleged use, make no mention of such a device, and it is incredible that Flanders should have invented or introduced an improvement of such marked utility without bringing its merits to the attention of the fire department, or making an effort to obtain a patent for it.

The remaining question is that of infringement.  The complainant's two expert witnesses testified that the device used by the defendant in its engine-houses contained the invention embraced in the first and fourth claims of the patent in suit, and the defendant's only expert witness testified, on cross-examination, to the same effect.  It is true that in the defendant's device the trip-rod receives the stroke of the hammer in its backward or reflex motion, while in the device described in the Bragg patent the rod receives the blow in the forward, or direct, stroke of the hammer.  But this mere alteration of the location of the trip-rod would readily occur to any skilled mechanic.  The effect of the tripping is the same, whether the rod receives the blow in the forward or backward action of the hammer.  Without dwelling in detail upon this and other structural differences, it is sufficient to say that I am satisfied the defendant's device embraces all the elements of the Bragg invention.  The conclusions I have reached are in harmony with the decrees entered in *Bragg* v. *City of Portland*, in the district of Oregon, *Bragg* v. *City of San Jose*, in the northern district of California, and the opinion of Judge SAWYER in *Bragg* v. *City of Stockton*, 27 Fed. Rep. 509.  Injunction granted as prayed for, and the case is referred to the master to take testimony and report the damages.