BRAGG MFG. CO. v. MAYOR, ETC., OF CITY OF NEW YORK et al.

(Circuit Court, S. D. New York. October 8, 1905.)

1. WITNESSES—REFRESHING MEMORY—NEWSPAPER ARTICLES.

Upon the issue of prior invention, witnesses testifying as to the use of such invention by others may properly refresh their memories as to the time of such use by reference to contemporaneous newspaper articles describing the invention which they read at the time.

[Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, §§ 877, 882, 888.]

2. COURTS—COMITY—PRIOR ADJUDICATION—VALIDITY OF PATENT.

Prior decisions sustaining a patent are to be given effect under the rule of comity only as to matters which were before the court. With respect to defenses or evidence not before the court the action of the court in a subsequent case is purely original.

3. PATENTS—PRIOR INVENTION—GONG ATTACHMENT FOR ENGINE HOUSES.

The Bragg reissued patent, No. 6,831 (original No. 165,438), for a gong attachment for engine houses, held void for prior use of the invention by others.

In Equity. On final hearing.

Eaton & Lewis (Eugene H. Lewis and John C. Rowe, of counsel), for complainant.

John J. Delaney (John R. Bennett, of counsel), for defendants.

HAZEL, District Judge. This is a suit in equity, instituted on June 15, 1891, for infringement of reissued letters patent No. 6,831 to Robert Bragg, dated January 4, 1876. The application was filed October 9, 1875. The validity of claims 3 and 4 of the patent has several times been sustained at final hearing. See Bragg v. City of Stockton (C. C.) 27 Fed. 509, and Walker v. City of Terre Haute (C. C.) 44 Fed. 70, where the opinions of the court are reported. The invention relates to "improvements in gong attachments for engine houses." The specification describes the mechanism operated automatically to utilize the force accumulated by the motion of a gong hammer in striking the gong. The object of the patentee was to contrive an adjustment of the assembled parts so that accumulated power could be transmitted to a place distant from the gong, and to enable the operation of the mech-

anism to effect the release of horses from their stalls or the ringing of a bell.   The specification states:

"My invention is principally applicable, however, to fire engine houses, where it can be used for releasing horses from their stalls at the very instant of the first stroke of an alarm, and for striking an alarm to awaken the engineer or fireman."

And that:

"My invention consists in the employment of an arm, which is so situated that at the first stroke of the hammer upon the gong it will also strike this arm, which has attached to it any suitable mechanism, so that the force of the blow will release through this arm, a weight.   The fall of this weight will pull a rope, which is connected with the mechanism to be operated, in such a manner that the pull upon it will operate the mechanism.   *   *   * The operation will be as follows:   The gong hammer, upon its first stroke, will strike the pad, E, and thus force the rod, D, and the arm, or lever, C, back until the roller, G, is released from the recess, F."

The claims involved read as follows:

"(1) The trip-rod, D, arranged as described, and the oscillating lever, C, for the purpose of releasing a suspended weight by the movement of a gong hammer, substantially as and for the purpose described.

"(3) In combination with the weight, B, caused to fall, as shown, the bell-crank lever, I, cord, K, and lever, L, for releasing the slide, O, and weight, R, and thus releasing the horses by means of the cord, T, substantially as herein described.

"(4) The trip-rod, D, oscillating lever, C, and suspended weight, B, in combination with the hammer of a gong, for the purpose of operating mechanism distant from the gong, substantially as above described."

Various mechanical devices, according to the specification, may be substituted to obtain the desired result.   The reissue did not consist of the details of construction or the configuration of the essential elements.   The principal point of novelty claimed is broadly the operation of the specified means directly from the gong hammer.   Complainant contends that the invention in suit was of broad scope, and that the patentee was a pioneer in the art.   This construction of the claims, however, upon the new facts presented, is thought to be beyond its due.   The defenses are anticipation, noninfringement, and prior use and invention by others.   The state of the art as shown by antecedent patents will be briefly considered.   In the patent of Chambers, No. 93,673, August 17, 1869, the device was used to move feed and water to animals at a predetermined time, the mode of operating the device being much like that of the apparatus in suit.   Its principal details of construction, though embodied in a different form from the gong attachment for engine houses in controversy, are nevertheless familiar mechanical equivalents.   In the Haller patent, No. 30,-141, of 1860, for improved electro-magnetic burglar alarm, the accumulated force was utilized for lighting a lamp by a match and ringing a bell.   According to the specification, a heavier device is moved to do that which a light gong hammer is incapable of doing.   The arrangement consisted of ropes or chains extending in front or on the side of the house, and passing over pulleys which were mechanically secured to double armed levers.   The arms of the levers were connected with a movable rock shaft, which had an arm extending therefrom, adapted to impinge a spring, closing the circuit of an electro-magnetic

alarm, and causing the hammer to sound a bell. On the first stroke of the hammer, the friction wheel of the self-lighter is set free, and a light appears. In the patent to Farmer, of 1859, No. 22,602, the drawing attached to the specification indicates a combination for operating a water motor by accumulated force, obtained by means of suspended weights. Reference to the simplified diagram in evidence and the Farmer patent, discloses that:

"If the motion of the armature, D, were employed directly to operate the valve, k, and to raise the detent, q, as it might be, a very great comparative electrical power would be required; but if the armature, D, is used only to liberate a weighted arm, poised nearly vertically, or a series of any number of weighted arms be employed, each arm being heavier than the one which precedes it, and employed to liberate that which succeeds it, the last one liberating the machinery by its momentum in falling, only a small fraction of the same electrical power will be required."

According to the defendant's expert witness, the citations substantially described the principle of the patent in suit, and that the complainant's apparatus is merely a trifling modification of that which was commonly known. The evidence, however, indicates that Bragg applied a known principle assisted by new instrumentalities, to a new use, and if he was the first and original inventor, something new was created of patentable merit. The patent therefore cannot be held invalid for want of novelty, despite the similarity of the principle of mechanism as shown in the anticipated patents. As was said in Diamond Drill & Machine Co. v. Kelly (C. C.) 120 Fed. 289:

"The principles of mechanics are always the same, and, in the almost endless combinations of them possible, it is not to be expected that duplicates will not occur."

Under the doctrine of Hobbs v. Beach, 180 U. S. 392, 21 Sup. Ct. 409, 45 L. Ed. 586, the adaptation of old elements to a new use, and the minor changes required for that purpose where a new industry was practically established, may be within the realms of invention. And, even though the anticipatory references belong to a nonanalogous class, they may still be considered to determine the scope of the claims. Jones v. Cyphers (C. C.) 115 Fed. 324. The question of patentability and construction of claims, however, is not necessary to the decision of this controversy. The comparisons that have been made between the Bragg device and the mechanism of the prior art were merely to indicate the probable scope of the claims, and the probability of its conception and use by others prior to the invention in suit. Haworth v. Stark (C. C.) 88 Fed. 512. Lee v. Upson & Hart Co. (C. C.) 43 Fed. 670. The evidence of prior use by others seems to be sufficient to defeat the patent. The invention of Flanders in 1869 will be briefly considered first. The testimony tending to show an installation of the device as early as 1869 is not entitled to probative weight. It was deemed strange in the Terre Haute Case, that if the device was publicly used as claimed, the attention of the committee from a Philadelphia engine company sent to the city of Boston in the spring of 1869 to inspect fire houses and apparatus was not apprised of the improvement. The evidence shows that some of the members of the committee visited the engine house where the device was claimed to have been in

actual use. The point was urged that contemporary records of the Boston fire department made no mention of such mechanism. True, the witness Flanders explained that the record of the fire department only scheduled property owned by the city, but it may still be presumed that if the device had been in public use as claimed, the attention of the visiting members of the committee would have been directed thereto. Furthermore, a number of witnesses, members of the engine company, testified that during their connection with the said engine company, in the year 1869, and for several succeeding years, their attention was never called to the device, nor did they ever hear of its use. Such being the evidential facts in relation to the suggested prior use, the conclusion reached by the learned court in the Terre Haute Case was undoubtedly correct.

To establish the defense of prior use, stress is justly placed upon the testimony relating to the Higgins and Bailey apparatus. The proofs show that, in 1872, Higgins was engineer of steam fire engine No. 6, in the city of Albany. He devised means prior to July 28, 1872, to automatically unfasten the horses in the stalls at the instant that the alarm was sounded. His recollection as to the exact time when the device was in use is based upon a news item in the Sunday Press, published in the city of Albany, on July 29, 1872. The said item graphically described the manner in which the horses were released and hitched to the pole of the engine under his (Higgins') supervision. Higgins narrated an incident which occurred on the night of September 1, 1872, by which his recollection was refreshed as to the time when the device was in successful operation. The gong, he stated, sounded an alarm of fire, and the horses quickly responding took their places, but, before they could be hitched to the steamer, they obstinately returned to their stalls, making it necessary to lead them to the engine. Soon afterward the horses, while proceeding to the fire, ran away into the river and were drowned. He produced a sketch drawn under his direction showing the device and modus operandi. He testified that, when the gong attached to the wall of the engine house struck a blow, a clamp was drawn back, operating to release a small weight, which, in turn, caused a larger weight to drop, and to thereby release the horses. Further describing his device he said:

"The chain going under the stalls along the timber, coming out to this counterweight that pulled the gas pipe that ran along the face of the mangers, and when that was pulled back the halter that held the horses was released, and the gong under it struck, and the horses threw up their heads, and ran out."

Defendant's witness McCabe, also an employé of the said fire engine house, corroborated Higgins in all material matters. He likewise refreshed his recollection regarding the time when the device was in successful use, by the news item mentioned. He referred to the occasion when the horses ran away, and the fact of their drowning. Afterward, the chief engineer, apprehending that the device might interfere with an alarm, objected to its use, and it was thereafter for a number of years simply used to open the stable doors, instead of to release the

horses. The difference between the Bragg and Higgins constructions was that in the former the horses were released by withdrawing an armature, while in the latter they were unfastened by a hammer coming in contact with the gong. The announcement in the Sunday Press may not accurately have described the Higgins construction, but it is clear that, before its publication, there was in actual use an automatic arrangement by which the horses were released upon the stroke of the hammer upon the gong.

Complainant contends that the device was merely an abandoned experiment. This, however, was not the fact, for the practicability and operativeness of the apparatus is abundantly shown by the evidence. That the use of the device was discontinued by the chief of the fire department does not warrant the presumption that it was incomplete or used merely as a trial test. No witnesses were called by the defendant to contradict or impeach Higgins, although he was subjected to the test of a cross-examination. As has been intimated, the device was substantially like that described in the specification in suit, and equivalent means were employed to attain the result.

The Bailey apparatus. In 1872, Bailey, who was in charge, as engineer of the steamer Hugh Ranken, altered a hand-lever device, then in use, by which the horses were released on the instant of sounding an alarm of fire. The change or alteration consisted of attaching the hand-lever device to the fire alarm telegraph. Bailey says that his device was in successful operation prior to June 20, 1872. It is undeniable that this improvement accomplished the result of the patent in suit by substantially similar means. The important question is whether the Bailey device was completed and successfully used at the time stated by him. Upon this point he is corroborated by three members of the steamer company, and also by newspaper publications and entries in the records of the company. The narratives of the witnesses would ordinarily be regarded as improbable, on account of the lapse of time, but here, as will now be shown, it was indisputably corroborated by facts and documents. The proofs show that on July 26, 1872, the Troy Times, a daily newspaper published in the city of Troy, printed an announcement of Bailey's adjustment and attachment to the fire alarm telegraph, by which the horses were released from their stalls. On the next day, an article of similar import appeared in the Troy Daily Whig. On July 29, 1872, the Troy Daily Press also contained a news item describing Bailey's improvement. Later, on October 1 and 2, 1872, other news items were printed, relating to said inventions. Such publications were distinctly remembered by the witnesses who testified upon the subject, and served to recall to their minds the exact period of time when the improvement was in public use. Such prior use is further shown as has already been said, by contemporaneous entries in official records kept by Bailey and the secretary of the engine company. The entries are as follows:

Monday, July the 14th: "Engineer Bailey commenced putting in his attachment for unhitching horses by means of the F. A. Telegraph."

On the 22d: "Working on hitching apparatus."

On Wednesday, the 23d: "Working on hitching apparatus."

On the 24th: "Completed the hitching apparatus to-day."

On Friday, the 25th: "Hitching apparatus as devised by Engineer Bailey works to a charm. The hammer of the gong in striking the blow, throws back a hinge which lets a small weight fall in the cellar, which, in turn, pulls back a bolt, and lets drop a heavier weight, which is connected by wire and cords with the hitching rod in the barn."

In the circumstances presented, there is no doubt that the Bailey invention was in actual public use before the application in suit, and continued in such use by the engine company mentioned for a number of years thereafter. It is true, the witnesses were unable to testify to an independent recollection of the precise date when the apparatus were first operated. Their memories, however, according to their declarations, were distinctly and positively refreshed by the newspaper items, they having read them at the time of their publications, and hence their evidence is entitled to probative weight. No satisfactory reason for discrediting such evidence has been suggested. The narrative by Higgins in relation to the horses running away and drowning is not helpful, but the significance of the news items in evidence, which directly referred to the subject-matter, and recalled the facts to Higgins and Bailey, cannot be overlooked.

I am not unmindful of the general rule as stated in Thayer v. Hart, (C. C.) 20 Fed. 693, and many other adjudged cases, that evidence of prior invention affords large opportunity for fraud, deception, or mistake, and it must be established by explicit and positive proof. The Bragg patent, having several times been sustained by courts of the highest integrity, a natural hesitation to reach a different conclusion is entertained. This controversy, however, is unquestionably determinative upon the presentation of new facts, from which an entirely different conclusion, I think, is justified. The rule of comity, as frequently said, has its limitations. In Mast Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856, the Supreme Court of the United States succinctly said:

"It has no application to questions not considered by a prior court, or, in patent cases, to alleged anticipating devices which were not laid before the court. As to such, the action of the court is purely original, though the fact that such anticipating devices were not called to the attention of the prior court is likely to open them to suspicion."

The alleged prior use by Flanders as said, was heretofore fully considered in a former litigation; but the devices of Higgins and Bailey together with the antecedent patents of Chambers, Haller, and Farmer were not before the court. After careful consideration, I have reached the conclusion that the Higgins and Bailey devices though unpatented, were in successful operation and use prior to the invention in suit; and that the defendant has established such use by a fair preponderance of the evidence and in accordance with the established rule. Such determination as already remarked renders it unnecessary to discuss more fully the scope of the claims in suit or the issue of infringement.

The bill is dismissed, with costs.