GENERAL ELECTRIC CO. v. MORGAN–GARDNER ELECTRIC CO.

(Circuit Court, N. D. Illinois, E. D.  October 24, 1907.)

No. 27,377.

PATENTS—INFRINGEMENT—ELECTRIC CONTROLLERS.

The Knight & Potter patents, No. 587,441, for an apparatus, and No. 587,442, for a method for regulating electrically driven mechanisms relating mainly to the regulation of speed and power in operating electric cars by means of controllers, construed, and *held* not infringed.

In Equity.  On final hearing.

Betts, Sheffield & Betts (Edward Rector and L. F. H. Betts, of counsel), for complainant.

Gardner, Stern, Anderson & Davis (Glenn S. Noble, of counsel), for defendant.

KOHLSAAT, Circuit Judge.  Complainant brings suit to restrain infringement of claims 1 and 2 of patent No. 587,441 for an apparatus, and claims 3, 4, and 9 of patent No. 587,442, for a method of regulating electrically driven mechanisms, both granted to Knight & Potter on August 3, 1897.  Claims 1 and 2 of patent No. 587,441 are as follows:

"1. In an apparatus for regulating the power and speed of mechanism driven by two electric motors, the combination of two electric motors, and a switch connecting them in series with each other and with a resistance, the switch provided with contacts and connections arranged to shunt one motor, leaving the other in series with a resistance, to disconnect one motor and to connect the two motors in multiple, all by successive steps.

"2. In an apparatus for regulating the power and speed of mechanism driven by two electric motors, the combination of two motors, and a switch for placing them in series with each other and with a resistance, the switch provided with contacts and connections adapted to cut out the resistance, for one rate of speed, to again cut in the resistance, to shunt one motor, to disconnect one motor and cut out the resistance, and to connect the two motors in multiple."

Claims 3, 4, and 9 of patent No. 587,442 read as follows:

"3. The method of regulating a car or vehicle driven by a pair of electric motors, which consists in connecting the motors in series, shunting one motor while maintaining a circuit through the remaining motor and through a resistance protecting the same, opening the circuit of the shunted motor and connecting the two motors in multiple.

"4. The method of regulating the power and speed of mechanism driven by a pair of series-wound electric motors receiving current from a constant potential circuit, which consists in first connecting the motors in series and in' circuit with resistance, then reducing the resistance until it is substantially cut out, then shunting one motor and again making use of the resistance to protect the unshunted motor, then disconnecting the shunted motor from circuit and finally reconnecting the motors in multiple."

"9. The method of regulating the power and speed of mechanism driven by two electric motors, which consists in placing the two motors in series for slow speed, and changing them from series to multiple for higher speed by first cutting one motor out of circuit, replacing it by a resistance in series with the other motor, and finally placing the two motors in multiple with the resistance cut out."

The two patents involve substantially the same thought, and may be considered together. The bill also alleges infringement of patent No. 507,547 for a controller, granted to A. P. Knight October 21, 1893; but complainant's brief does not seriously discuss it. There being 23 claims to this patent and the particular claims relied on not being specified, they are not here set out, but reference had to the record.

What complainant claims to have discovered is the transfer of motors from series to multiple and back again by shunting one of the motors and introducing dead resistance to offset its withdrawn motor and live resistance, and thus prevent the injury that might otherwise ensue to the unshunted motor, and then disconnect the shunted motor from its series portion and move it to multiple. Neither in the claims, the specifications, or the drawings does it appear that the resistance is kept in the circuit after the act of disconnection. The diagram position known as No. 7 of the drawings in the apparatus patent shows the resistance removed. The language of the claims and specifications is not inconsistent with its retention. It is this step which defendant claims differentiates the patents in suit from its device and method. It uses resistance until the multiple relation of motors is effected. Complainant's device relates mainly to the regulation of speed and power in operating electric cars by means of controllers, and, while it does not admit that it cuts out resistance in move 7, it insists that the shunted motor, being attached to the other axle, does not lose its live resistance, so that it is in condition to take its share of the current without undue sparking, as soon as it is switched into multiple, so that the two motors at once present the necessary live resistance.

If complainant's grantors were the first to provide for passing the motors from series to multiple by the shunting of one motor and at the same time, introducing dead resistance to compensate for the withdrawn resistance and thus protect the unshunted motor, it would not seem to be a matter of much moment for the purposes of this suit whether defendant added one more step or not. At most, it could only be an improvement on the devices in suit. Defendant would be using the ideas, and consequently the invention of the patents in suit. It is uncertain from the record whether complainant's move from series to multiple—the final step—does not employ the necessary resistance, whether dead or alive. The evidence does not satisfactorily disclose a practical advantage in defendant's method and apparatus over that in suit. Both find it necessary to use a blow-out. It seems clear that, assuming complainant's patents to be valid, defendant infringes.

Therefore it becomes necessary to look into the state of the art as it was on August 3, 1897. Switching from series to multiple was admittedly old at the time of this alleged invention. The great question in that field was to ascertain some way in which it could be done entirely without or with a minimum of friction. A number of prior patents are set up in the record dealing with this very question, of which only those of the British patent to Reckenzaun, 1884, Condict's patent of 1888, the British patents to Anderson, 1884 and 1889, the two patents to Wightman, 1890 and 1891, respectively, the Mason patent of 1893 and 1895, and the patent to Knight, 1893, in suit, need be considered. Reckenzaun is one of the first to suggest the regulation of speed and power by varying the motor connections from series to parallel or multiple. It does not disclose the method of making the change. Reckenzaun was among the first, if not himself the first, to suggest and provide for the use of two motors or more in both series and parallel for the regulation of speed. He says (page 1, line 70):

"By means of switches or commutators, I can arrange the circuit so that two or more motors may run in series, in parallel, or singly, or partly series and partly parallel or an independent current from that in the armature continually pass through the field magnets. The speed as well as the power can be varied in this manner; for, as the resistance of the whole circuit changes, so also changes the speed of the armature when the electro-motive of the supply-current is constant."

He nowhere discloses what precaution he takes, if any, in passing from series to multiple, and consequently cannot be held to have anticipated the idea of the patents in suit.

Condict brings his invention directly to the matter of protecting the motors in switching from series to multiple and return, and attempts to overcome sparking and short circuiting during the move. "To overcome these objections," he says, "I have constructed my switch so that at the time of changing the connections I insert resistances more or less great according as to the resistance of the motor connections; that is, to say if the motor resistance is great the auxiliary resistance would be small, and vice versa. I also so arrange the switch that the resistances are all cut out of circuit as soon as the new motor connection is made. Their function is to reduce the current flowing, so that at the time of making the change in the motor connections the current is small compared with what it would be if these resistances were not inserted, and, furthermore, these resistances are gradually cut in and out so as not to suddenly change the resistance to the current beyond a given amount. * * * This cutting in and out of the resistance-coils takes place with every new movement of the switch," etc. He provides for a device which he says avoids throwing too strong a current onto the motors at the time of the change. He does not, however, shunt the reduce to a practically dead condition, one of the motors, and at the same time protect the other by dead resistance, as claimed in the patents in suit, and there must be a point at which the circuit is opened in both motors. In the device of the patents in suit the circuit of the unshunted motor is never opened. The language of claims 30 and 31 would seem broad enough to have covered the device in suit, but it evidently was not in the inventor's mind at the time.

The diagram of the Anderson patents shown in evidence discloses one of the motors in a shunted relation, but without any resistance protection to the remaining motor.

Wightman short circuits one motor before making the change. This he provides shall be done "after its counter electro-motive force has been reduced to a point where the short-circuiting may be accomplished without sparking." He uses no auxiliary resistance to protect the unshunted motor.

No diagram of the Mason devices is shown in the record, except such as appear in the drawings. These are somewhat obscure. He seems to make the transition from series to multiple gradual by a rather intricate manipulation of the field magnet coils and armatures with relation to the several motors. In the absence of explicit descriptions of the workings of these moves, it is difficult to ascertain just what relation these steps bear to those of the device in suit. From such consideration as it has been reasonably possible to give to the matter, it is not believed that the Mason patents cover the exact and patented devices in suit.

As before noted, counsel for complainants give very casual attention to the Knight patent in suit. Very little or no material evidence was taken with regard to it, which leads the court to the conclusion that relief is not seriously sought as to it. However, the defendant insists that it contains the invention claimed by the Knight & Potter patents in suit, and it therefore becomes necessary to examine the patent and such evidence as appears in the record with regard to it, since it is in the prior art with regard to the Knight & Potter patents, application having been filed June 26, 1892. "This invention," says the patentee (page 1, line 9), "relates to means for controlling electric motors, and for transferring such apparatus from series to multiple relation, or vice versa, without at any time wholly breaking the circuit of either of such motors." It appears, however, that such is not strictly the case. The series circuit is broken after both motors have been shunted into multiple relations; the shunt circuits being each provided with a resistance. He says (page 1, line 20):

"This resistance is in fact preferably such that under the normal conditions of use at the time of transfer, each resistance branch will take about the same current that passes through each of the electric devices."

If this be so, manifestly there must be a breaking of the current which passes through the motors when the former series current is cut out. This must throw an additional current into the former shunt circuits, which now will be formed to be protected by the dead resistances placed therein. Thus both motors are shunted, and both are protected, by dead resistance. The circuit of neither of the motors is broken as claimed by the patentee. In the Knight & Potter patents the circuit of one motor is entirely opened. If, therefore, there is any invention in the Knight & Potter patents, it must be found in the fact that they accomplished one-half of what Knight covered. There is nothing in the record to show what the advantage of their alleged invention was over Knight's. In fact, there was rather a step backward than forward. It is true that in the field of electrical improvements

it requires oftentimes a very slight advance to work out large results; but it must be an advance. Perhaps the devices of Knight & Potter are of value to show what can be done with the electric current. The moves of the switch are so swift that we cannot follow it, but no doubt the current responds to every variation of its governors as clearly as though they were slow and distinct. The Knight & Potter patents may be based upon these instantaneous combinations effected by the switch. Their arrangement seems, at least theoretically, much inferior to that of Knight.

There is another matter urged by defendant. It appears that in their original application Knight & Potter laid no claim to the intro-duction of protection to the unshunted motor by means of resistance. In their original specifications they say that their "method in general consists in regulating the power and speed mechanism driven by two electric motors by placing the two motors in series for slow speed and changing them to multiple connection for higher speed, by first shunt-ing one motor while its field magnet is still engaged, and then dis-connecting one terminal of such motor and reconnecting it to the cor-responding terminal of the other motor, whereby the two motors may be in multiple with each other. We accomplish this without the use of external means, such as a circuit breaker or resistance to interrupt or substantially reduce the current while the change is being made." We look in vain for any reference in the original claims and specifica-tions to the use of external resistance in making the move from series to multiple. They seem to contemplate only the regulation of speed. The only suggestion of the use of resistance is found in the diagrams shown as figures 1 to 9 in each of the patents.

In Hobbs v. Beach, 180 U. S. 397, 21 Sup. Ct. 409, 45 L. Ed. 586, it has been decided that, where the original specifications and drawings of an application suggest the new claim, it may properly be tendered as an amendment. As above noted, the specifications expressly exclude dead resistance. It was clearly considered and rejected. An ex-amination of the file wrapper and contents shows that it was this use of resistance that eventually saved the patent. No new specifications were added for several years. The amendment was never sworn to, but was a suggestion of the patentee's attorneys. The court is not advised of the matters required by the statute to be put in the form of an affidavit as to this new combination. It was held in Eagleton Mfg. Co. v. West Co., 111 U. S. 490, 4 Sup. Ct. 593, 28 L. Ed. 493, that where an inventor makes oath to an application and dies, and amend-ment, which is not a mere amplification of the application, must be sworn to by his administrator, and that, in the absence of such an oath, the grant was void. To the same effect are Railway Company v. Sayles, 97 U. S. 554, 24 L. Ed. 1053, and many other cases. See Walker on Patents, § 138. Surely the mere diagrams of the drawings cannot be held to warrant the express negation of the specifications and the silence of the claims.

For the above stated reasons, it is held that the defendant does not infringe either of the Knight & Potter patents. No relief being asked as to the Knight patent in suit, the bill is dismissed for want of equity.