GEAR et al. v. FAIRMOUNT ELECTRIC & MFG. CO. et al.

(Circuit Court of Appeals, Third Circuit. April 4, 1916. Rehearing Denied May 5, 1916.)

No. 2072.

1. PATENTS ⊚═328—VALIDITY AND INFRINGEMENT—CONNECTOR FOR ELECTRICAL CONDUCTORS.

The Williams patent, No. 831,815, for connector for electrical conductors, while not of broad scope, was a step in advance in the art, which turned failure into at least comparative success, and discloses patentable invention in the feature of hermetically sealing the joint. Such element was also within the original application fairly construed; also *held* infringed.

2. PATENTS ⊚═157(1)—CONSTRUCTION OF CLAIMS—"HERMETICALLY."

The word "hermetically," as used in a patent claim in describing the sealing of a joint, should be given its popular meaning, as describing a

⊚═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

joint which is practically impervious to air and moisture, and not confined to a rigidly scientific sense.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229, 230; Dec. Dig. ☞157(1).]

3. PATENTS ☞172—SCOPE—ADVANTAGES NOT DESCRIBED OR CLAIMED.

That the specification and claims of a patent do not refer to all of the advantages of the invention is not material; the patentee is entitled to the benefit of such advantages, although he may not have mentioned or known of them.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 247; Dec. Dig. ☞172.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Suit in equity by Harry B. Gear and Paul F. Williams, doing business as Gear & Williams, against the Fairmount Electric & Manufacturing Company and others. Decree for defendants, and complainants appeal. Reversed.

For opinion below, see 225 Fed. 61.

A. M. Belfield, of Chicago, Ill., for appellants.

J. Bonsall Taylor and E. H. Fairbanks, both of Philadelphia, Pa., for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. [1] The patent in suit, No. 831,815, which was issued to Paul F. Williams in September, 1906, was addressed to a problem that had only been imperfectly solved, namely, how to unite satisfactorily the ends of two electric conductors—for example, two cables, or a cable and an overhead conductor. A number of inventors had been busy with the subject, and definite steps had been taken towards success. The state of the art in 1906 is fairly represented by the patents that are referred to in the opinion below (225 Fed. 61), and are relied on now by the appellees—Cobb, 396,543, issued in 1889; Eckert and Gregory, 442,575, issued in 1890; and Tailleur, 593,442, issued in 1897. So far as appears, the first two of these devices did not go into use, and after a year's trial the Tailleur connection was discarded as ineffective. The principal trouble with them all seems to have been that the connection was imperfect, so that air and (especially) moisture were able to enter before long, and thus to cause short-circuiting between the conductor and its surrounding envelope. As such an envelope is usually of lead, and as short-circuiting always does harm, sometimes much harm, to the apparatus and other property, and may also endanger life, a connection that would eliminate these perils as far as possible was evidently most desirable. The device now in question seems to have had much success in this direction; the evidence shows that severe tests have been applied to it with excellent results, while the opinion entertained of its merits by those familiar with the electric current under service conditions is sufficiently indicated by its extensive and rapidly growing use. It has come to have a name of its own, "pot-head," and several varieties are shown in the drawings.

In this suit we are concerned only with the form illustrated in Figures 1 to 4, which will be explained by the following quotation from the specification (in which the reference numbers are omitted):

"The principal object of the invention is to provide a simple, practical, and effective connector or joint of the kind described, and especially to dispense with the use of a solder wipe-joint therein. * * *

"Referring first to Figs. 2, 3, and 4, the device shown comprises a casing and a cover or hood, fitted to the open top of the casing, both made of insulating material—such, for example, as porcelain. A cable is extended up through an aperture in the bottom of the casing and provided with a terminal, which is conveniently in the form of a metallic spindle provided with a socket adapted to receive the end of the conductor of the cable, and also provided with a larger outwardly-facing socket. This terminal is also provided with a laterally-projecting flange to hold its center within the casing, the side portions of this flange being cut away. This terminal is secured to the cable conductor, preferably by soldering such a conductor in the socket provided for it.

"The space between the cable and its terminal and the interior walls of the casing is filled with minerallac or other suitable insulating material. The hood is provided with another terminal conveniently in the form of a plug, having a split end, adapted to fit in the socket of the terminal. The terminal is secured to the end of a conductor, to which the cable is to be connected. As a convenient arrangement the terminal is provided with a socket adapted to receive the conductor, and the latter is soldered therein. The aperture in the top of the hood to receive the terminal is also filled with insulating material—such, for example, as minerallac.

"In using the device the cable is first inserted through the lower end of the casing and pushed up through the same, so that its conductor projects from its open end, so as to be accessible, and then the terminal is soldered to the conductor. The cable with its terminal is then pushed back into the casing, and minerallac or other insulating material is poured into the cavity thereof, until it fills or substantially fills the same, such material passing down below the flange by reason of the cut-away portions thereof. The terminal is then secured to the conductor and the split end thereof secured to said terminal, whereupon the cover is placed upon the top of the casing and the split plug pushed into the socket, thereby connecting the cable with the conductor or other cable. Thus it will be seen that the necessity of a wipe-joint in forming a terminal or connection for the cable is avoided, and at the same time the cable can be disconnected from its connection by merely removing the cover.

"In using the device it may be used as shown in Fig. 1, in which is illustrated a pole or post, along the side of which extends a pipe, containing the cable; the upper end of the latter being provided with the terminal embodying my invention, which for convenience is fastened by a band, attached to a block on the pole. The pole is shown provided with a pair of insulators, to which is connected the overhead conductor, which is extended to and through the same and connected with the cable. In disconnecting the cable the cover, if removed, will hang as shown in dotted lines in Fig. 1. In Fig. 3 is shown the device with the cover partly removed, showing how its separable terminals become disconnected from one another."

The claims are as follows:

"1. A device of the class specified, comprising a pair of separable members composed of insulating material, said members receiving and confining the ends of the conductors to be connected, means for connecting said conductors, and insulating material hermetically sealing the confined ends of the conductors and the connecting means therefor within said separable members.

"2. A device of the class specified, comprising a pair of separable members both made of insulating material and provided with means for engaging and forming a tight joint with one another, means whereby the ends of the conductors within said members can be connected with one another, and insulating cement filling said members and hermetically sealing the conductors and connecting means therein.

"3. A device of the class specified, comprising an insulating sleeve adapted to receive the cable end, said sleeve being made of insulating material, a top also made of insulating material and adapted to fit over the end of said sleeve, connecting devices applied to the ends of the cable and of the conductor, and insulating cement substantially filling said sleeve and hermetically sealing the ends of the cable and the connecting device therefor.

"4. A device of the class specified, comprising an insulating sleeve adapted to receive the cable end, said sleeve being made of insulating material, a top also made of insulating material and adapted to fit over the end of said sleeve, connecting devices applied to the ends of the cable and of the conductor, insulating cement substantially filling said sleeve and hermetically sealing the ends of the cable and the connecting device therefor, the top being provided with a chamber containing a connecting device for a conductor, which chamber opens outwardly and receives the conductor, and insulating cement filling said chamber and hermetically sealing the end of the conductor and the connecting device therefor.

"5. A device of the class specified, comprising an insulating sleeve for the end of the cable, a connecting device to be applied to the end of the cable, comprising a pair of oppositely open sockets and a disk portion, insulating cement filling said sleeve and hermetically sealing the end of the cable and said connecting device therein, a top having a socket adapted to fit over the end of the insulating sleeve, a connecting device consisting of a plug adapted to fit in the socket of said other connecting device, a chamber in the end of the top, said chamber containing the end of the connecting device of the top, and insulating cement filling said chamber and hermetically sealing the end of the conductor and connecting device therein."

We may say at once that we agree with the District Court in seeing nothing novel in this patent except the element of hermetically sealing. This, however, is the vital point; and, while the patent must be regarded as narrow in scope, we think it belongs to that class in which a small, but inventive, step has been sufficient to turn failure into at least comparative success. But we are unable to agree that the element of hermetically sealing was new matter introduced without the sanction of an oath during the progress of the application. On the contrary, although the specification (which has not been changed in any particular) did not use these words, we think its description of the device always implied the fact signified by the phrase, and we have no difficulty in finding this element referred to in several claims of the first two sets, although not in so definite a form as appears in the third and final set.

[2] In our opinion the situation in the Patent Office was such as we continually find. An inventor tries to cover as much ground as possible; the examiner tries to confine him within the precise area in the art still unoccupied; and the result of the struggle is that, after various turns of phrase have been employed in an effort to reach a compromise, the claims at last emerge in their final form. Seymour v. Osborne, 78 U. S. (11 Wall.) 544, 20 L. Ed. 33; De La Vergne Co. v. Featherstone, 147 U. S. 229, 13 Sup. Ct. 283, 37 L. Ed. 138; Hobbs v. Beach, 180 U. S. 395, 21 Sup. Ct. 409, 45 L. Ed. 586. "Hermetically" sealing evidently bears its popular meaning—that is to say, such a sealing as makes the joint impervious, or practically impervious, to air and moisture—and the phrase should not be confined to a rigidly scientific sense. It seems clear to us that the Williams pot-head does accomplish this degree of sealing, and that the patentee taught the art how to make the necessary structure. The heart of his invention

appears to be such an arrangement of parts as will furnish a casing composed of a sleeve or hollow cylinder and a cap fitting over it, both made of insulating material; these two parts being capable of easy separation by hand, and the interior of each being so fashioned and arranged that when insulating material is poured in it will fill the cavity, and will thus surround the conductor and the connecting means completely and will exclude the air and the moisture from the joint.

[3] It is true that the specification and the claims do not refer to all the advantages that seem to accompany the device, but this is not material. If a specification or a claim be sufficient in itself, it need not be all-embracing. It will still be good as far as it goes; and, if it does not go as far as it might have gone, that is the inventor's affair. The evidence before us seems to prove satisfactorily that one advantage of the Williams device is the facility it affords for narrowing the area of search whenever "trouble" occurs in an electric circuit; and another advantage is the more effective protection it affords to men busy with repair or inspection. It is readily installed, is harmless if accidentally touched, and can be easily and safely connected and disconnected without the use of tools. The inventor is entitled to reap the benefits of these advantages, although he may not have mentioned them, or even known of them, provided they come to light in operating the device actually described and claimed. The present invention may be narrow—an improvement, rather than a primary thought—but the presumption of validity exists, and the record is unusually bare of evidence to attack it. At the best, the defendants have done no more than raise a doubt concerning the existence of inventive quality, and we think the scale is turned in favor of the patent by the undisputed evidence in reference to its merits and extensive use.

We shall not prolong the discussion, except to say that infringement has not been successfully disproved. The District Court had no occasion to consider the subject, and we shall only add that, when the two devices are examined side by side, the need for argument disappears. The infringement is contributory, but the evidence discloses all the elements of such an infringement.

The decree is reversed, with instructions to enter a new decree in accordance with this opinion.