### In re LUKS.
### Patent Appeal No. 3257.

Court of Customs and Patent Appeals.
April 2, 1934.

———

E. Clarkson Seward, of New York City, for appellant.

T. A. Hostetler, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office, affirming the decision of the Examiner, rejecting, for want of invention over the prior art, claims 28 to 46, inclusive, and claim 53 of appellant's application, filed March 17, 1928. In the brief of appellant before us the appeal as to claim 53 is withdrawn and therefore the appeal as to said claim will be dismissed, so that there remain for disposition in this appeal claims 28 to 46, inclusive. Claims 51 and 52 of the application were allowed. Of the claims on appeal, claim 28 is representative and reads as follows:

"28. Apparatus designed for milking the animals of a group in succession, said apparatus comprising, a movable platform, means for actuating the same, means enabling the ingress of the animals to the platform and their egress therefrom, and means for milking the animals while on the platform and moving from the point of ingress to the point of egress."

The references relied upon are: MacKenzie, 333,393, January 29, 1895; Cordier (German), 208,905, of 1908; Murray, 1,068,807, July 29, 1913; Haggerty et al., 1,147,164, July 20, 1915; Irwin, 1,452,426, April 17, 1923; Uphaus et al., 1,603,429, October 19, 1926; Wilde et al., 1,613,213, January 4, 1927.

The alleged invention is well described in the Examiner's statement as follows, which quotation has been incorporated in appellant's brief as an accurate description of the invention claimed:

"The alleged invention is directed to a milking installation for a large scale dairy farm. It comprises a slowly rotating circular annular platform divided by radial partitions into a plurality of stalls. A walkway leads up to the platform level on the outer circumference and by means of this walkway cows may walk into the stalls on the platform as said stalls slowly pass the walkway. At slightly less than 360° around from the entrance walkway there is an exit walkway which leads from the inner circumference of the annular platform into the center space and thence through a tunnel under the platform to the outside thereof. The entrance and exit walkways are connected at their outer ends to form a closed path and along this path are built shelters for housing the cows. A cow is thus led from its shelter up the entrance walkway to the platform, is carried around the platform to the exit walkway, and walks down the exit walkway, under the platform and back to its shelter.

"As the cow steps on the platform, showers carried by each stall and connected with a fixed water reservoir beneath the platform are actuated to wash the animal as the platform moves along. Additional showers fixed to the foundation along the periphery of the platform also aid in the cleaning. As the platform moves farther the showers are disconnected, the animals are brushed by hand, and the particular stall comes opposite a hot air dryer located on the foundation along the periphery of the platform. After the stall passes the drying means the teat cups of a milker which is carried by the platform is attached to the cow's udder and milking continues until the stall substantially completes its journey from the entrance to the exit point. The valves of the milking machine are actuated at proper points in the travel of the milking unit by fixed actuators carried by the foundation at such points. As

the stall nears the exit point the teat cups are removed, the cow is manually stripped and then walks off the platform."

The Examiner held it to be common practice in various arts "in which articles or units are to be subjected to several successive processes to provide a rotatable platform, means for placing the units on the platform, and means for removing the units from the platform when the process has been completed," citing the Haggerty and Wilde references. He specifically rejected all of the claims on appeal upon Wilde, Irwin, and MacKenzie, holding in effect that the alleged combination was aggregative, and upon the further ground that the claims were lacking in invention over the art of record. Claims 40 to 45, inclusive, were further rejected on the ground that the requirement in said claims for a closed path made by the walkway connecting the entrance and exit of the platform, and placing shelters along such walkway, is no more than a convenient arrangement "well within the expected knowledge of one working in the field of farm management." He further held that the details of the spraying device constituting an element of claim 46 was not inventive in view of the spray means and mounting therefor shown by Haggerty.

The Board of Appeals concurred with the Examiner in holding that claims 28 to 33, inclusive, were not patentable in view of Wilde. As to claims 34 to 39, the board indorsed the position taken by the Examiner that the additional features therein contained did not render said claims patentable in view of Irwin and MacKenzie. The board further followed the Examiner in holding that claims 40 to 45, inclusive, containing the elements of the closed path and shelters along the walkway, were not by virtue of said elements made patentable, but that these elements merely called for a convenient arrangement. The holding of the Examiner that the spraying feature of claim 46 was not patentable in view of Haggerty was also followed by the board, and his decision denying patentability of all of the claims was affirmed. While it refers to the finding of the Examiner that the claims are "aggregative," the board does not in its decision express any opinion upon this point.

As hereinbefore stated, the Board of Appeals expressly rejected claims 28 to 33, inclusive, upon the patent to Wilde, and, with respect to the balance of the claims, held that the additional elements therein contained, not found in Wilde, were shown by other of the cited references, and that there was no invention involved in combining the elements shown by the prior art as appellant has done.

We will first discuss the patentability of said claims 28 to 33, inclusive. In the decision of the Board of Appeals it is stated as follows:

"The patent to Wilde et al. shows an annular moving platform upon which automobiles are run in succession for the purpose of cleaning, drying and polishing them while they are carried around on the platform. Concerning this reference the Examiner holds:

" 'To use such a device in the treatment of cows and to add a milking machine to the apparatus acting on the units while on the platform is an obvious modification of the Wilde device in the light of the type of units being treated.'

"With cows substituted for automobiles and a milking machine added to the equipment on the platform the structure of this patent would substantially respond to the construction called for in claims 28 to 33."

The patent to Wilde et al. relates to an apparatus for cleaning and polishing automobiles, including a movable or rotatable carriage in the form of a circular platform made of curved beams connected by crossties, onto which platform the automobiles pass from a stationary platform. At intervals around the movable platform is arranged suitable apparatus for manipulation by the operators to effect a thorough cleansing and polishing of an automobile in its travel from the entrance to the exit upon the moving platform. The exit is upon the same stationary platform from which the automobiles pass to the movable platform.

We agree with the board and the Examiner that if appellant's apparatus is an obvious modification of the Wilde device, in the light of the type of units being treated, then claims 28 to 33, inclusive, should be rejected. Conversely, if the Wilde reference is no bar to these claims, it is clear that they should be allowed, since it is apparent that Wilde is the principal and most pertinent reference to these claims and no other reference is so applicable to them.

It does not appear to us, however, that to one skilled in the art of dairying, or in the art of washing and polishing automobiles, or in the art of manufacturing movable platforms, it would be obvious that the device of Wilde et al. could be adapted and used for the purpose of the expeditious and orderly

milking of cows, and we hold that the art of milking cows is nonanalogous to the art of washing automobiles or the other art cited with reference to movable platforms. The mechanical art of building movable platforms for the purpose of washing automobiles is clearly not analogous to the art of building movable platforms for the purpose of the expeditious and orderly milking of cows.

While Wilde had the right to use his apparatus for any purpose to which it was suited, under well-established principles of law, it is also true that invention may lie in adapting it for use in a nonanalogous art. Of course, Wilde's device, as disclosed, could not, without adaptation for that purpose, be used for milking cows.

In the leading case of Potts & Co. v. Creager, 155 U. S. 597, 15 S. Ct. 194, 198, 39 L. Ed. 275, the court said:

"* * * When a patented device is a mere improvement upon an existing machine, and the case is not complicated by other anticipating devices, the solution is ordinarily free from difficulty. But, where the alleged novelty consists in transferring a device from one branch of industry to another, the answer depends upon a variety of considerations. In such cases we are bound to inquire into the remoteness of relationship of the two industries, what alterations were necessary to adapt the device to its new use, and what the value of such adaptation has been to the new industry. If the new use be analogous to the former one, the court will undoubtedly be disposed to construe the patent more strictly, and to require clearer proof of the exercise of the inventive faculty in adapting it to the new use, particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to a branch of industry but remotely allied to the other, and the effect of such transfer has been to supersede other methods of doing the same work, the court will look with a less critical eye upon the means employed in making the transfer. Doubtless, a patentee is entitled to every use of which his invention is susceptible, whether such use be known or unknown to him; but the person who has taken his device, and, by improvements thereon, has adapted it to a different industry, may also draw to himself the quality of inventor. * * *

"Indeed, it often requires as acute a perception of the relations between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo. * * * (Italics ours.)

"As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but if the relations between them be remote, and especially if the use of the old device produce a new result, it may at least involve an exercise of the inventive faculty. Much, however, must still depend upon the nature of the changes required to adapt the device to its new use."

In the case of Hobbs v. Beach, 180 U. S. 383, 21 S. Ct. 409, 413, 45 L. Ed. 586, the court said:

"It appears from the testimony that several of these addressing machines, of which that of Dennis and York is a type, and which are now claimed to have inspired the Beach patent, had been upon the market for many years, and yet it never seems to have occurred to any one engaged in the manufacture of paper boxes that they could be made available for the purpose of attaching strips to the corners of such boxes. *This very fact is evidence that the man who discovered the possibility of their adaptation to this new use was gifted with the prescience of an inventor.* While none of the elements of the Beach patent—taken separately or perhaps even in a somewhat similar combination—was new, their adaptation to this new use and the minor changes required for that purpose resulted in the establishment of practically a new industry, and was a decided step in advance of any that had heretofore been made.

"We agree that if the Dennis and York machine were designed for the purpose of attaching together the edges of paper boxes, where each surface was in line with the other, with the aid of flat dies and platen, it would require no invention, in view of other anticipating devices, to change this to dies with diverging faces for gluing boxes at their corners. But that is not all. Beach did not have before him a machine for attaching strips to the corners of paper boxes, but a machine for attaching addresses to newspapers, and while there is an analogy, there can scarcely be said to be a similarity in these functions. We agree with the courts below that it did involve invention to see that a machine of the Dennis and York type was adaptable to the work of the Beach device,

and, second, to make such changes as were necessary to adapt that device to its new function. With all the anticipating devices before us, it is apparent that the mere change in the shape of the dies was a minor part of the work involved in so changing the Dennis and York machine as to make it perform a wholly different function, *the invention consisting rather in the idea that such change could be made than in making* the necessary mechanical alterations. * * * " (Italics ours.)

In the case of Western Electric Co. **v.** Larue, 139 U. S. 601, 11 S. Ct. 670, 35 L. Ed. 294, the court upheld a patent to one who took a torsional spring, such as had previously been used in clocks, doors, and other articles of domestic furniture, and applied it to telegraph instruments, the application being shown to be wholly new.

Perhaps the most applicable authority to the case at bar is our decision in the case of In re Burrows, 40 F.(2d) 1011, 1012, 17 C. C. P. A. 1254. That case involved the patentability of claims for a display counter consisting of a pan set on the top of a counter, with refrigerating coils in the pan covered with sand and water, the water being formed into ice, providing a smooth surface simulating the glass top of a table.

The claims were rejected by the Patent Office tribunals upon two references, one of which was a patent to one Carpenter and the other a German patent. We held that the Carpenter reference did not anticipate Burrows' invention. With respect to the German patent we said:

"The German patent to Hildebrandt discloses a flooring for indoor skating rinks. The manner of forming the ice and maintaining the same is almost identical with the method of applicant."

After quoting at length from the decision in Potts & Co. v. Creager, supra, we said:

"It is argued by the Solicitor for the Patent Office that appellant was entitled to no more than he obtained by the claims which were allowed in the Patent Office, which claims covered features of appellant's structure not disclosed in the references, and that the substitution of the method of refrigerating the skating rink floor for the method of providing a display shelf did not constitute invention, but was merely a substitution which mechanical skill alone would suggest.

"The record discloses that the idea occurred to no one but the applicant, and we cannot agree that the substitution of a process connected with a floor used in a skating rink for that of a refrigerating counter for food did not constitute inventive genius. Certainly there is considerable doubt on this question. This doubt should have been resolved in favor of the applicant."

In the case at bar we are of the opinion that the adaptation of the Wilde apparatus, which comes nearest to anticipating appellant's alleged invention, to the purpose of the orderly and expeditious milking of cows, required the exercise of the inventive faculty and was not obvious to one skilled in any art here involved. It follows, therefore, that said claims 28 to 33, inclusive, should be allowed.

All of the remaining claims on appeal, except claim 53, have the elements comprising said claims 28 to 33, inclusive, and, in addition, one or more elements which the Patent Office tribunals held were shown by the other cited prior art. In view of our finding of patentability of said claims 28 to 33, inclusive, it follows that the remaining claims, except said claim 53, are likewise patentable, irrespective of whether or not the additional elements contained in said remaining claims are shown by the cited prior art.

Further, in view of our conclusion with respect to the patentability of the claims over the reference Wilde, which is the most pertinent, it is not necessary to discuss the other references cited, other than to say that, singly or combined, they do not anticipate appellant's claims.

Appellant's claims are all apparatus claims. Inasmuch as we find that it involved the exercise of the inventive faculty to adapt apparatus of prior nonanalogous art to the purpose of milking cows, it cannot be held that the claims are aggregative.

For the reasons stated herein, the decision of the Board of Appeals is reversed as to all claims here on appeal except claim 53; as to this claim, the appeal is dismissed for the reason hereinbefore stated.

Modified.

HATFIELD, Associate Judge, did not participate.