### ROOT et al. v. HOBBS MFG. CO.

(Circuit Court of Appeals, Second Circuit. November 5, 1923.)

#### No. 55,

1. Patents ⬦⟶328—1,131,161 and 1,196,721, for a safety device held infringed, and not anticipated.

    Root patents, No. 1,131,161 and No. 1,196,721, for a safety device to protect employees using a punching machine in manufacturing paper boxes, *held* not anticipated, a pioneer patent, and infringed by defendant's mechanism, which accomplished the same result by transposing the parts, while using the same principle, and which came on the market after plaintiff's device had been established in the industry.

2. Patents ⬦⟶237—Mere transposing parts will not protect infringer.

    Equity will not permit an infringer to escape the consequences of his act by an attempt to disguise, which merely transposes parts, while using the same principle, and the equivalent of mechanisms made clear by the drawings, specifications, and claims of the patent sued on.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Charles F. Root and others against the Hobbs Manufacturing Company, for infringement of letters patent granted to Charles F. Root, in which each of the plaintiffs have an interest. Decree for plaintiffs, and defendant appeals. Affirmed.

Frederick P. Fish, of Boston, Mass., George H. Kennedy, Jr., of Worcester, Mass., and J. L. Stackpole, of Boston, Mass., for appellant.

Charles F. Dane, of New York City (William F. Hall, of Washington, D. C., of counsel), for appellees.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. The first patent in suit, No. 1,131,161 is for a safety device for punching machines. The second, No. 1,196,721 is for a safety device. On this appeal, the principal question contested is that of infringement. The device is a mechanism designed to prevent the crushing of the fingers of the operator while she is engaged in feeding paper stock for paper box manufacturing on an automatic machine known as an automatic paper box corner staying machine. The corner staying machine is now well established in the trade or art of making paper boxes.

[1] The art of making paper boxes requires that squares be set or reinforced at the corners, where a union of the sides and ends are made and the application of adhesive strips of paper or muslin placed upon the joints. The corners are thereby strengthened before receiving their final covering of paper. The work of thus strengthening the corners of paper boxes by these adhesive strips had been performed in a tedious, irregular manner, by hand, prior to the invention of the automatic machine in question. This machine consists of an anvil or lower die, having at the upper portion two working faces which diverge downward from one another at a right angle. There is a vertical movable die or plunger, which works in connection with the anvil or die, having two diverging working faces. The working faces of the plunger form a notch therein, which notch co-operates with the upper portion of the lower anvil or die; the dies being adapted to operate upon the right angle corner of the box to compress the said corner between the working faces of the opposing dies. A strip of paper suitable for a stay is fed by the automatically moving mechanism over the pasting device and between a pair of shears, and thence between the upper and lower die when separated. When a box corner is to be strengthened by the addition of a stay strip, it is placed upon the lower anvil or die; the inside of the corner of the box resting upon the apex of the lower die. As the machine revolves, it then feeds forward the stay strip, which has the paste upon it, and as the lower die descends, the shears also operate severing from the continuous stay strip, a portion sufficient for the stay. As the cutting operation is completing, the upper die or plunger is descending, and forces the gummed stay strip into position upon the outside of the box corner, and the stay strip and box corner are pressed between the working faces of the two opposing dies, and thus the stay strip is caused to conform to and be stuck upon the corner of the box. When the upper die or plunger rises, the box with its attached stay strip can be removed, and another corner placed in a position for another operation. See description in Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586.

The machine not equipped with the device made under the patent in suit proved to be dangerous to the operator, the danger consisting in the possibility of her fingers being caught between the die and the anvil during the course of the rapid movements in the operation of the machine. Young girls were employed as operators, and when skilled

in the trade could make 48,000 box corners per day. They were usually paid by the piece. Thus there was created a hazardous employment, which frequently resulted in the amputation of the fingers of the operator. This caused the trade to seek some safety device, and the appellee declares it obtained one in the patent in suit. It consists of dividing the link which connects the actuating shaft and the reciprocating tool carrier into two mutually collapsible parts, held together by a yieldable connection until the tool is just about to come in contact with the work, when, through automatic means, the two parts of the link are rigidly connected, in order to force the tool to perform the necessary work. Because of the normal yieldable connection between the two parts of the connecting link, when the fingers of the operator are caught between the descending tool and the work, the part of the link connected to the actuating shaft is permitted to continue and complete its stroke, while the part of the link connected to the tool carrier, by reason of the release of the yielding connection between the two parts of the link, is no longer forced toward the work. The resulting relative motion between these two parts permits the making of the rigid connection between the part connected to the operating shaft and the part connecting to the reciprocating tool carrier, so that the operator's fingers, while pinched, are not crushed in the machine. Thus there is substituted, for the solid link, a two-part collapsible link connecting the operating shaft and the reciprocating tool carrier of the machine. This is the subject of the first patent.

The second patent consists of mechanism by which the object connecting with the operating shaft is in its working stroke first locked to the part connected to the moving tool carrier, then released from it, and finally relocked to it, just as the tool is about to contact with the work in the normal operation of the machine. If the operator's fingers are between the tool and the work, the second locking of the parts is prevented, and the operator's fingers are not crushed. In the machine, the bottom die or anvil is fixed to the bed plate of the machine, or it may be stationary in space. It has a punch or upper die, which is movable in space toward and from the other bottom die or anvil. At one end of the upper shaft there is a disc, from the face of which, eccentrically thereof, a pintle projects. The disc and pintle form in effect an ordinary crank. The upper die is mounted in a carrier intended to be constantly reciprocated in a vertical direction by power shaft through the interposition of a link. This arrangement is such that the die is moving at its maximum velocity when it is half way down, and this movement is gradually retarded to zero at the end of the stroke.

This mechanism is no part of the invention in suit. In lieu of the solid link, the invention provides a two-part link as described, one of which telescopes in the other. One of these parts or link sections may be considered a part of the carrier for the upper punch. The other link section is provided at its upper end with an opening to receive the power shaft pintle and its body, with a bore opening out through its lower end. The other section of the link which, as stated, may be part of the die carrier, consists of a head and a shank telescoping in the bore of the first section. Bolts are associated with the second sec-

tion, for preventing it, at certain times, from moving relative to the first section. These bolts are mounted on the upper ends of levers pivoted intermediate their ends to the second section, and having their lower ends connected with a spring tending to hold the bolts retracting or out of locking position. The operating arms for these levers or bolt carriers are pivotally connected to section 1 and interengage each other, so that they will swing in unison, and the upper end of the arm is provided with a lateral extension intended, as the upper die approaches the end of its down stroke, to strike the resilient tripper secured to the machine frame, and throw the bolts between the opposing surfaces of the first and second sections, provided the second section occupies its normal position; when thus shot into locking position, the bolts locks section 2 against movement relative to the upper link section, and then to all intents and purposes the machine is the same as when equipped with a solid link. The tripper is so positioned, and it may be adjusted, that the extension will contact therewith only after the two dies are in close juxtaposition, so that the operator's fingers are not or cannot be inserted between them. If the operator's hand or fingers are caught between the dies, the upper die in section 2 will be arrested, and section 1 continues to move the space between sections 1 and 2 for the reception of the bolts, and it will be so contracted that the bolts cannot be shot into locking positions, and consequently, when the projection strikes the tripper, the latter will yield, and the stroke of section 1 will complete, but the power shaft will be ineffective for exerting pressure on the dies. This may result in a crushing, but will not mangle the fingers.

Of course, when the operator's hand is out of the zone of danger, the machine operates with rapidity, fastening the strip, and obtaining the maximum pressure from the power shaft. In the second patent, the bed corresponds to the stationary die, and the platen to the movable die. The carrier has the platen mounted to its upper end, and its lower end is pivotally connected to a member pivoted to the stationary form and connected by a link to a pin projecting from the face of the disc carried by the steam shaft. A locking belt is provided for preventing movement of the pivoted platen carrier relative to the member. The disc is provided with a cam acting through interposed mechanism for forcing the bolt into its retracted or unlocked position against the tension of a spring, and tends to move the bolt into its locking position. In the operation of the machine, the bolt initially is in locking position, and prevents the platen and carrier therefor from collapsing in the member. During the movement of the platen toward the body, the bolt is moved into unlocking position, and finally the bolt is again moved into locking position for insuring the pressure of the power shaft being applied to whatever is between the bed and the platen. Should the operator's fingers be caught between the platen and the bed, then a relative movement of the carrier and member takes place, so that the bolt cannot be shot into its locking position, and, as a consequence, the power of the power shaft is rendered ineffective.

The principle of operation of the mechanism of both patents is somewhat similar, but there are mechanical differences, in that the movement die or platen is mounted at the free end of a pivoted arm

or carrier, while in the first patent the movable die carrier is not a pivoted member; also a cam, through intermediate mechanism, moved a bolt out of locking position against the tension of a spring tending to hold it in locking position, whereas, in the first patent, a trip, through interposed mechanism, moved a bolt into locking position against the tension of the spring, tending to hold the bolt out of locking position.

The need for a safety device to guard against the many injuries was clear and called for inventive thought. After placing the machine of the Knowlton Company on the market, it met with great commercial success, and it was even stated that no accident has ever happened which resulted in the amputation of the operator's fingers after this device was placed in use. We regard the invention as having great merit, and entitled to a broad range of equivalents. We think the appellant accomplishes the same result—providing safety for operators by substantially the same means as that employed by the appellee.

The appellant's mechanism came upon the market after the appellee's had been developed and had been well established in the industry. Its safety mechanism is so contrived that it is associated in operation with the lower die, rather than the upper die. This required certain changes in details. Instead of the locking bolt co-operating with the upper die carrier, it is associated with the lower die carrier. It was an easy task to apply the principles of the appellee's invention to the lower rather than the upper die. In appellee's patent, the upper die carrier is normally movable in space, but through the desired mechanism it has a capacity to remain stationary should the operator's fingers be caught between the dies. The appellant's arrangement of associating the safety mechanism with the lower and normally stationary die necessarily required that the lower die should have a capacity to move, should the operator's fingers be caught between the dies. The appellant has given it capacity to move in space.

In the appellant's patent drawings, the locking bolt is normally held in unlocked position by a cam against the tension of a coiled spring and helical spring. The cam operates through a bolt crank lever. The normal position of the parts at the commencement of a stroke is shown. During the whole of the compression stroke, save when the dies are in such juxtaposition that the operator's fingers are not and cannot be inserted between them, the bolt occupies its retracting position, and during this period the lower die carrier has capacity for movement. In appellee's structure, during this same period and because the bolts are retracted, the upper die carrier has capacity to remain stationary. In appellant's device, if all goes well, then the aforesaid juxta-opposed relation is reached, the bolt is moved beneath the die carrier, and locks such carrier against movement, so that full compression force of the upper shaft is made effective. Should the operator's fingers get caught between the dies, then the lower die and carrier will be moved relative to the bolt into a position and in such a way that, in a continued operation of the machine, the bolt cannot be shot into its locking position by its operating spring.

In both structures, the bolt is automatically shot into locking position, if all is well, so that the power of the power shaft is made effec

tive during each stroke of the machine. If the operator's fingers get caught between the dies, then the bolt cannot be shot into locking position, and the power of the power shaft cannot become effective. The appellee was the first to build a safty mechanism which was devoid of all parts within the working zone, and which eliminated the necessity for the operator being concerned with the presence of any parts in that zone, and there was no need of her fingers being placed in this dangerous zone.

We think that the mechanism used by the appellant, when considered with the wide range of equivalents to which this patent is entitled, justifies the claims of the appellee that the appellant has copied the principle and construction of the appellee's device. The date of the invention granted to the appellant was after that of the appellee's grant of letters patent. We do not think that appellee's mechanism involved in its design any serious problem, or anything different than that which was taught by the appellee's construction. We regard the patent in suit as a pioneer.

We think that all the claims of the first patent (Nos. 6, 17, 19, and 21) and claim 17 of the second patent have been infringed. As to claim 6 the appellant has a reciprocating member with collapsible means in connection with the said member, and automatic means operable on the operative stroke of the member slightly in advance of an engagement of the member with the work when the path of the member is free to hold the collapsible means rigid; and as to claim 17 it has a reciprocating working member with a safety device comprising normally freely telescoping members adapted to render telescopic members rigid at adjustable distances from the work; and as covered by claim 19 has the work performing element, and has its actuating means effective upon resistance being offered to the operative movement of the work-performing element prior to its engagement with the work; and as covered by claim 21 it has two opposing elements, one movement upward and from the other actuating member, which is controlled by the movable element, to render its actuating means ineffective upon resistance being offered to the operative movement or movable element. Like claim 17 of the second patent, it has a frame with a member pivoted thereto and automatic means to rigidly lock the pivoted member and means to operate locking means; to unlock the pivot member and thereby permitting it to yield.

The principle patent relied upon as anticipation is the German patent, No. 153,214, to Sundhoff. This patent is concerned in the mitigation of damage to the machine in case of brakage, and was not thought to be a prevention of injury to the operator of the machine. Indeed, there was nothing to indicate that in the operation of that machine, the operator's hand would ever come into contract with the compacting punch of the machine. The patent does not show an operative means of any sort or of a mechanism for safeguarding an operator from injury, or that the operator's hand would come into a zone of danger. We do not think that this patent in any way limited the scope of the appellee's invention. The patent to Hazel & Holbeche was for a wing guard safety device and was for a time used. It proved in-

efficient and unsuccessful and was discarded. It is not now used. It consisted of a pair of wing guards which swung about sweeping about the top of the anvil. In construction or principle it in no way suggests the patent in suit.

[2] Associating the safety mechanism with the lower instead of the upper die does not avoid infringement. A court of equity will not permit an infringer to escape the consequences of his act by an attempt to disguise, which merely transposes the parts, but uses the same principle and the equivalents of mechanism made clear by the drawings and specifications and claims of the patent sued on. Hutter v. De Q. Bottle Stopper Co., 128 Fed. 284, 62 C. C. A. 652; International Time Recording Co. v. W. H. Bundy Recording Co., 159 Fed. 468, 86 C. C. A. 494; Garrison v. Eagle, 229 Fed. 159, 143 C. C. A. 435.

We feel required to accord to this meritorious invention its proper place in the art, and to hold that none of the patents offered as part of the prior art constitute anticipation. We think it is plain that the appellee infringes.

Decree affirmed.